1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9 RUSSELL MARTIN,                           CASE NO. 1:06-cv-00906-BAM PC

10                         Plaintiff,        ORDER GRANTING DEFENDANT'S MOTION
                                            FOR SUMMARY JUDGMENT

11        v.                                 (ECF Nos. 73, 79, 80)

12 SULLIVAN, et al.,

13                         Defendants.
   _____/

14

15 **I.    Background**

16        Plaintiff Russell Martin ("Plaintiff") is a state prisoner proceeding pro se and in forma

17 pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. The complaint in this action was

18 filed on June 26, 2006. (ECF No. 1.) The parties have consented to the jurisdiction of the

19 Magistrate Judge. (ECF Nos. 3, 39.) On February 24, 2011, Defendant Bryant's motion for

20 summary judgment was granted, and Plaintiff's Eighth Amendment claims based upon a strip search

21 in the presence of female officers was dismissed. Plaintiff was granted leave to file a second

22 amended complaint. (ECF No. 45.) This action is now proceeding on the second amended

23 complaint, filed August 9, 2011, against Defendant Bryant for violations of the Fourth Amendment.

24 (ECF No. 55.) On February 24, 2012, Defendant Bryant filed a motion for summary judgment.

25 (ECF No. 73.) After receiving an extension of time, Plaintiff filed an opposition[1] on April 23, 2012,

26 and Defendant filed a reply on April 30, 2012. (ECF Nos. 79, 80.)

27 _____

28        [1]Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
   Court in an order filed on March 20, 2009. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

1   For the reasons set forth below, the Court finds that Defendant Bryant and the unidentified

2   defendants are entitled to summary adjudication on the grounds of qualified immunity.

3   **II.   Summary Judgment Legal Standard**

4   Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when

5   it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party

6   is entitled to judgment as a matter of law.  Summary judgment must be entered, "after adequate time

7   for discovery and upon motion, against a party who fails to make a showing sufficient to establish

8   the existence of an element essential to that party's case, and on which that party will bear the burden

9   of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the court is to

10   liberally construe the filings and motions of pro se litigants.  Thomas v. Ponder, 611 F.3d 1144, 1150

11   (9th Cir. 2010).  The "party seeking summary judgment bears the initial responsibility of informing

12   the district court of the basis for its motion, and identifying those portions of the 'pleadings,

13   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

14   which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S.

15   at 323 (quoting Rule 56(c) of the Federal Rules of Civil Procedure).

16   If the moving party meets its initial responsibility, the burden then shifts to the opposing

17   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

18   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

19   of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

20   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

21   material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475

22   U.S. at 586 n.11.

23   The parties bear the burden of supporting their motions and oppositions with the papers they

24   wish the Court to consider and/or by specifically referencing any other portions of the record for

25   consideration.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

26   The Court will not undertake to mine the record for triable issues of fact.  Simmons v. Navajo

27   County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

28   ///

III.   **Defendant's Motion for Summary Judgment**

A.     **Statement of Undisputed Facts**[2]

1.     Plaintiff Russell Martin (E-67269) is a California State prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR").

2.     Plaintiff was incarcerated in an administrative segregation unit (Ad-Seg) at California Correctional Institution, Tehachapi (CCI) at all times relevant to his Second Amended Complaint.  (Martin Dep. 20:17-21; 21:18-22, Dec. 22, 2011.)

3.     Defendant M. Bryant was a supervising Correctional Lieutenant at CCI in November 2005. (Bryant Decl. ¶¶ 2, 7, ECF No. 73-3.)

4.     On the morning of November 15, 2005, Plaintiff informed a female correctional officer that he was not getting along with his cellmate and needed to be moved.  (Martin Dep. 27:20-25; 28:2-5.)

5.     Afterwards, Plaintiff packed up his personal property in anticipation of a cell transfer. (Martin Dep. 28:3-6.)

6.     Later in the day, when a different correctional officer released Plaintiff for his designated shower time, Plaintiff told the officer that he and his cellmate were not getting along, and that Plaintiff was not going to return to his cell.  (Martin Dep. 28:6-9.)

7.     The correctional officer put Plaintiff in a holding cell and called the sergeant on duty. Plaintiff informed the sergeant that he and his cellmate were no longer compatible, and Plaintiff asked to be placed in a different cell.  (Martin Dep. 28:11-16; Bryant Decl. ¶ 8.)

8.     Plaintiff was assigned a new cell in a different housing unit, but his personal property was not immediately transferred to the new cell.  (Martin Dep. 28:17-22; 29:3-7; Bryant Decl. ¶ 9.)

---

[2]Plaintiff neither admitted or denied the facts set forth by Defendant as undisputed nor filed a separate statement of disputed facts.  Local Rule 260(b).  A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).  However, in this instance, neither Plaintiff's second amended complaint nor affidavit in support of opposition has been verified by Plaintiff.  Because Plaintiff neither submitted his own statement of disputed facts nor addressed defendants' statement of undisputed facts, the court accepts Defendant's version of the undisputed facts.

9.     Defendant Bryant talked with Plaintiff and told him that due to the cell transfer he would receive his personal property after the Security Housing Unit property officer had a chance to process it.  (Bryant Decl. ¶ 9.)

10.    Plaintiff was upset that his personal property was not transferred to the new cell.  (Martin Dep. 28:23-25.)

11.    Plaintiff, who is African-American, coordinated a protest with six-to-seven African-American inmates in his new housing unit.  All of the inmates agreed to block their cell windows to get the attention of a senior prison official at CCI. (Martin Dep. 29:8-14; 30:5-9; 42:9-43:19; 46:1-12; Bryant Decl. ¶ 10.)

12.    It is a violation of CDCR's and CCI's institutional rules for an inmate to block his or her cell window.  (Martin Dep. 42:6-8; Bryant Decl. ¶ 11.)

13.    A blocked cell window is disruptive to institutional operations, and it presents various threats to institutional security.  (Bryant Decl. ¶¶ 11-13.)

14.    Correctional staff are statutorily required to perform inmate counts at various times throughout each day, during which correctional staff must account for each inmate through a visual observation to confirm that the inmate is present, alive, and breathing. When an inmate's window is blocked, correctional staff cannot account for that inmate as required by law, necessitating an emergency cell entry. (Cal. Code Regs. tit. 15 § 3274(a) (2011); Bryant Decl. ¶ 12.)

15.    A blocked cell window presents an immediate threat to institutional security because staff cannot tell whether an inmate is making weapons, doing drugs, attempting suicide, or otherwise harming himself or his cellmate.  Thus, a blocked cell window requires an emergency cell entry because of the unknown threat that a covered window poses to staff and inmate safety.  (Bryant Decl. ¶ 13.)

16.    The cell windows in Plaintiff's Ad-Seg housing unit were approximately 6 inches wide by 3 feet long, and were the only means of seeing in and out through the housing unit's cell doors.  (Martin Dep. 26:11-16.)

17.    After Plaintiff and the other African-American inmates blocked their cell windows, several

correctional officers talked with the men and tried to get them to remove their window coverings, but Plaintiff and the other inmates refused to comply.  (Martin Dep. 30:18-21; Bryant Decl. ¶ 14.)

18.   Defendant Bryant directed one of his staff to begin assembling a cell extraction team. (Martin Dep. 30:22-23; 54:15-55:12; Bryant Decl. ¶ 15.)

19.   Because Plaintiff's cell window remained covered, like the cell windows for the other six-to-seven African-American inmates in Plaintiff's housing unit, Defendant Bryant prepared to begin conducting cell extractions for all inmates participating in the group protest. (Martin Dep. 30:22-23; Bryant Decl. ¶¶ 15, 22.)

20.   A cell extraction is when officers dressed in riot gear forcibly remove an inmate from his cell.  The extraction begins when officers shoot pepper spray or some other chemical agent into the cell to temporarily incapacitate the inmate, and then enter the cell with haste, restraining the inmate once all members of the cell extraction team are inside. (Martin Dep. 31:5-8.)

21.   Because of the uncertainties involved in a blind cell entry, every cell extraction has the potential for violence and presents an unnecessarily high risk of injury to staff and the inmate(s).  (Martin Dep. 31:9-12; Bryant Decl. ¶ 20.)

22.   Both male and female personnel are expected to participate on cell extraction teams. (Bryant Decl. ¶ 21.)

23.   Shortly afterwards, two correctional officers talked with Plaintiff and told him that they would talk to the Facility Captain the following day about Plaintiff's property dispute if Plaintiff would remove his window covering.  (Martin Dep. 31:21-23.)

24.   Plaintiff removed his window covering, and he directed the other African-American inmates to remove their window coverings as well.  (Martin Dep. 32:6-9.)

25.   After removing his window covering, Plaintiff talked with Defendant Bryant about his personal property dispute.  Plaintiff was ordered Plaintiff to "cuff up." (Martin Dep. 32:16-20.)

26.   Defendant Bryant was ordered by the Administrative Office of the Day (AOD) to place

1    Plaintiff on management cell status.  (Bryant Decl. ¶ 23.)

2    27.   Management cell status is a behavior modification device for disruptive inmates.  An inmate

3          placed on management cell status has everything removed from his cell, which becomes a

4          "management cell," and he progressively earns privileges (e.g., writing materials,

5          entertainment appliances) back through good behavior.  (Bryant Decl. ¶ 24; Martin Dep.

6          40:8-11.)

7    28.   Not all inmates placed on management cell status have their clothing privileges revoked. If

8          an inmate had misused his clothing, however, to cover his window or to tie his food port

9          shut, for instance, his clothing would be reduced to a bare minimum while on management

10         cell status.  (Bryant Decl. ¶ 25.)

11   29.   After the AOD had ordered Plaintiff to be placed on management cell status, Defendant

12         Bryant told him what was going to happen.  Plaintiff initially refused to come out of his cell

13         so that it could be cleared, but after several members of the cell extraction team went to

14         Plaintiff's cell, he decided to come out.  (Bryant Decl. ¶ 26.)

15   30.   Plaintiff was handcuffed and taken to a holding cell in the housing unit's day room. (Martin

16         Dep. 32:20-25; Bryant Decl. ¶ 26.)

17   31.   While Plaintiff was in the holding cell, in order to facilitate a medical inspection and because

18         of the potential for Plaintiff to misuse his clothing to block his cell window when returned

19         for management cell status, Defendant Bryant ordered Plaintiff to remove all of his clothing

20         but Plaintiff refused to comply.  (Martin Dep. 33:4-8; 54:4-10; Bryant Decl. ¶ 28.)

21   32.   Before an inmate is placed on management cell status, Defendant Bryant always insists that

22         medical staff examine the inmate for any injuries, in order to ensure the inmate's health and

23         safety.  (Bryant Decl. ¶ 31.)

24   33.   When Plaintiff refused to remove his clothing, Defendant Bryant ordered correctional staff

25         to remove Plaintiff from the holding cell and to strip him of his clothing. (Martin Dep. 33:8-

26         10; Bryant Decl. ¶ 29.)

27   34.   Two unidentified correctional officers handcuffed Plaintiff, removed him from the holding

28         cell, and removed all of his clothing.  (Martin Dep. 53:2-12; Bryant Decl. ¶ 30.)

35.   Plaintiff was then visually examined by a female medical technical assistant, lasting five-to-ten seconds.  (Martin Dep. 33:19; 61:16-63:10; Bryant Decl. ¶ 30.)

36.   The female medical attendant did not touch Plaintiff's genitals or otherwise contact him at any time.  (Martin Dep. 62:23-63:10.)

37.   While Plaintiff was in the day room area, because he was being placed on management cell status for blocking his cell window, two-to-three correctional officers went to his cell and removed the bedding and linens, among other things, in order to remove items Plaintiff could use to cover his windows.  (Martin Dep. 33:19-22; 61:4-11; Bryant Decl. ¶ 27.)

38.   Approximately 10-15 male and female correctional officers and medical attendants were present in the day room area while Plaintiff was being examined.  (Martin Dep. 54:15-21.) Plaintiff did not recognize any of these officers as among those typically assigned to his housing unit because they apparently came from outside Plaintiff's housing unit to assist with the planned cell extractions.  (Martin Dep. 55:2-12.)

39.   Among the group assembled, one female correctional officer and two female medical technical assistants were present.  (Martin Dep. 58:14-18; 59:7-10.)

40.   After Plaintiff was visually examined by the female medical technical assistant, he was escorted back to his empty cell, given a pair of paper boxer shorts, and placed on management cell status.  (Martin Dep. 33:22-24; 34:2-4; 39:13-15; 64:13-23; Bryant Decl. ¶ 30.)

41.   Plaintiff stayed on management cell status in his empty cell for approximately three days.  (Martin Dep. 40:15-16.)

42.   Plaintiff did not earn the return of any privileges during his three-day assignment to management cell status.  (Martin Dep. 41:8-10.)

### B.   Defendant's Position

Defendant Bryant argues that he and the unidentified officers are entitled to qualified immunity because, at the time of the strip search of Plaintiff in November 2005, there was no clearly established law giving a correctional officer notice that conducting a strip search in front of members of the opposite sex would be a violation of an inmate's Fourth Amendment rights.  (Motion for

1   Summary Judgment 5, ECF No. 73-1.)  A review of case law from the Ninth Circuit demonstrates

2   that Defendant Bryant and the unidentified officers were not on notice that a non-emergency strip

3   search of an inmate in front of female correctional and medical staff would violate a clearly

4   established right in November 2005.  (Id. at 7-8.)  At that time, the law explicitly permitted cross-

5   gender strip searches and strip searches performed in the vicinity of female correctional personnel

6   on a case-by-case basis.  (Id. at 8.)  In Grummet v. Rushen, 779 F.2d 491 (9th Cir. 1985), the Ninth

7   Circuit considered a claim by male inmates that female officers viewing them partially or totally

8   nude while showering, being strip searched or using the toilet violated their right to privacy.  The

9   Ninth Circuit found no Fourth or Fourteenth Amendment violation and affirmed the grant of

10  summary judgment for prison officials.  (ECF No. 73-1 at 7.)

11          Three years later in Michenfelder v. Sumner, 860 F.2d 328 (9th Cir. 1988), the Ninth Circuit

12  considered whether routine strip searches were unreasonable and violated an inmate's privacy rights

13  when they were conducted within view of female correctional officers.  Female officers were not

14  routinely present for the searches and did not conduct the strip searches except in emergencies.  The

15  Ninth Circuit recognized that inmates maintain a limited right to bodily privacy, but found that

16  searches were reasonable and did not violate the inmates privacy rights and that the division of

17  responsibilities between male and female guards was a reasonable attempt to accommodate the

18  tension between the inmates privacy rights and the prison's internal security needs.  (ECF No. 73-1

19  at 8.)

20          Lastly in Somers v Thurman, 109 F.3d 614 (9th Cir. 1997), the Ninth Circuit considered a

21  Fourth Amendment claim arising out of cross gender strip searches where female officers directly

22  participated.  (ECF No. 73-1 at 8.)  The district court found a clearly established violation, but the

23  Ninth Circuit reversed holding that female officers were entitled to qualified immunity because the

24  male inmates did not have a clearly established Fourth Amendment privacy interest prohibiting cross

25  gender strip searches.  The court further observed in dicta that even in 1997, it was highly

26  questionable whether male prisoners had a Fourth Amendment right to be free from routine

27  unclothed searches by female officers or being viewed unclothed by correctional officers of the

28  opposite sex.  (Id. at 9.)

It was not until <u>Byrd v. Maricopa Cnty. Sheriff's Dep't</u>, 629 F.3d 1135 (9th Cir. 2011), that the Ninth Circuit determined that a non-emergency search of a male pretrial detainee by a female cadet was a Fourth Amendment violation.  Defendant contends that at the time of the search at issue here, <u>Grummet</u>, <u>Michenfelder</u>, and <u>Somers</u> were controlling and a non-routine visual strip search of a male inmate in the presence of female officers did not violate a clearly established right.  (ECF No. 73-1 at 9.)

### C.    <u>Plaintiff's Position</u>

Plaintiff argues that there are genuine issues of material fact that exist as to whether Defendants violated his Fourth Amendment rights under <u>Byrd</u>.[3]  (Affidavit of Russell Martin in Support of his Opposition 1, ECF No. 79.)  Plaintiff states that Defendant admits to violating his Fourth Amendment rights and the response was not reasonable, but an exaggerated response to the situation.  At the time Plaintiff was strip searched, he had complied with officers and the situation was over.  (<u>Id.</u> at 2.)

Plaintiff claims that Defendant Bryant's declaration is false because Defendant Bryant did not talk to him as he claims in his declaration.  (<u>Id.</u>)  Also, when an inmate is moved from one cell to another he packs up and moves his own property and there was no reason for his property to be processed by the property officer.  (<u>Id.</u> at 2-3.)  Plaintiff contends that the Court's function is not to weigh conflicting evidence with respect to disputed material facts and, at this stage, is legally precluded from resolving the disputed issues.  Plaintiff requests that Defendant's motion for summary judgment be denied.  (<u>Id.</u> at 3.)

### D.    <u>Defendant's Response</u>

Defendant responds that Plaintiff has failed to address the qualified immunity issue entirely.  (Reply 1, ECF No. 80.)  While Plaintiff argues that Defendant's conduct would be a violation under <u>Byrd</u>, it is immaterial for the purposes of the qualified immunity analysis.  At the time of the incidents alleged in this action, controlling law explicitly counseled that a non-routine, visual strip

---

[3] Plaintiff attempts to include a due process claim in this action.  Plaintiff may not now expand the scope of this litigation via deposition testimony or his opposition to Defendant's motion for summary judgment.  <u>See</u> <u>Gilmore v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004).  Plaintiff's claims are confined to those screened and found cognizable by the Court.  (ECF No. 55.)

1  search of a male inmate in the vicinity of female officers did not violate clearly existing law.

2  Plaintiff has offered no argument to the contrary. (Id. at 2.) Plaintiff's allegations that Defendant

3  Bryant's declaration is false is belied by the evidence attached to Plaintiff's opposition.

4  Additionally, it is irrelevant whether Plaintiff spoke with prison officials regarding his personal

5  property being withheld. Even assuming that there was a factual dispute as to whether Plaintiff and

6  Defendant had a conversation regarding Plaintiff's personal property such a dispute is immaterial

7  and cannot defeat summary judgment on the basis of qualified immunity. (Id. at 3.) Defendant

8  Bryant's motion for summary judgment should be granted on the grounds that he is entitled to

9  qualified immunity. (Id. at 4.)

10  **E.   Discussion**

11  The Court finds that Defendant has met his initial burden of informing the Court of the basis

12  for his motion, and identifying those portions of the record which he believes demonstrates the

13  absence of a genuine issue of material fact. The burden therefore shifts to Plaintiff to establish that

14  a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith

15  Radio Corp., 475 U.S. 574, 586 (1986).

16  The doctrine of qualified immunity protects government officials from civil liability where

17  "their conduct does not violate clearly established statutory or constitutional rights of which a

18  reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting

19  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Alston v. Read, 663 F.3d 1094, 1098 (9th Cir.

20  2011). To determine if an official is entitled to qualified immunity the court uses a two part inquiry.

21  Saucier v. Katz, 533 U.S. 194, 200 (2001). The court determines if the facts as alleged state a

22  violation of a constitutional right and if the right is clearly established so that a reasonable official

23  would have known that his conduct was unlawful. Saucier, 533 U.S. at 200. A district court is

24  "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

25  immunity analysis should be addressed first in light of the circumstances in the particular case at

26  hand." Pearson, 129 S. Ct. at 818; Alston, 663 F.3d at 1098.

27  Although Plaintiff argues that genuine issues of material fact exist that preclude the Court

28  from granting Defendant's motion, the inquiry as to whether the right was clearly established is

1  "solely a question of law for the judge." <u>Dunn v. Castro</u>, No. 08-15957, 2010 WL 3547637, at *2

2  (9th Cir. Sept. 14, 2010) (quoting <u>Tortu v. Las Vegas Metro. Police Dep't.</u> 556 F.3d 1075, 1085 (9th

3  Cir. 2009)).  While there are instances where factual disputes prevent the court from deciding the

4  issue of qualified immunity, <u>see</u> <u>Liston v. County of Riverside</u>, 120 F.3d 965, 967 (9th Cir. 1997);

5  <u>Collins v. Jordan</u>, 110 F.3d 1363, 1369 (9th Cir. 1997); <u>Alexander v. City</u> of San Francisco, 29 F.3d

6  1355, 1364 (9th Cir. 1994); <u>ACT UP!/Portland v. Bagley</u>, 988 F.2d 868, 873 (9th Cir. 1993), the

7  factual issues which Plaintiff attempts to raise by challenging Defendant's Bryant's deposition are

8  irrelevant to the qualified immunity issue here.

9        It is undisputed that Plaintiff was unhappy about his personal property being withheld when

10  he was transferred to another cell and encouraged other inmates to participate in a protest to gain the

11  attention of supervisory personnel by violating prison rules.  (UF 10, 11, 12.)  In response, Defendant

12  Bryant had called for a cell extraction team to assemble to extract the six to seven protesting inmates

13  from their cells.  (UF 11, 18.)  When the inmates voluntarily removed the coverings from the

14  window of their cells, Plaintiff was removed from his cell in order to place him on management cell

15  status.  (UF 24, 26.)

16        After Plaintiff was taken to a holding cell in the unit's day room, Defendant Bryant ordered

17  that Plaintiff strip so that medical staff could examine him for injuries prior to placing him on

18  management status.  (UF 31, 32.)  Plaintiff refused to remove his clothing, so Defendant Bryant

19  ordered that Plaintiff be removed from the holding cell and for the correctional officers to remove

20  his clothing.  (UF 33.)  Plaintiff's clothing was removed by two correctional officers, and Plaintiff

21  was examined by a female medical technical assistant.  (UF 34, 35.)  The female medical technical

22  assistant did a visual examination , but did not physically touch or contact Plaintiff at anytime.  (UF

23  36.)  There were approximately ten to fifteen correctional personal present in the day room, including

24  a female correctional officer and another female medical technical staff.  (UF 38, 39.)  The relevant

25  inquiry is whether Plaintiff had a clearly established right to not be strip searched by and in front of

26

27

28

1   correctional and medical personnel of the opposite sex in November 2005.[4]

2      "For a constitutional right to be clearly established, it contours must be sufficiently clear that

3   a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536

4   U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002).   This does not require that the specific actions

5   complained of must have been found to be unconstitutional, but in light of pre-existing law the

6   unlawfulness of the actions must be apparent so the official has fair notice that his conduct would

7   deprive the individual of a constitutional right.  Hope, 536 U.S. at 739-40, 122 S. Ct. at 2515.

8      A prisoner's legitimate expectation of bodily privacy from person's of the opposite sex is

9   extremely limited.  Jordan v. Gardner, 986 F.2d 1521, 1524 (9th Cir. 1993).  In 1985, the Ninth

10  Circuit decided Grummett v. Rushen, in which male inmates claimed that female officers viewing

11  them partially or totally nude when they showered, dressed, used the toilet, or were strip searched

12  violated their right to privacy.  Grummett, 779 F.2d at 492.  While recognizing that elementary self-

13  respect and personal dignity compel individuals to desire to shield their unclothed body from the

14  view of strangers and particularly strangers of the opposite sex, the Court found no violation of the

15  Fourth Amendment by the casual observation or pat down search by an official of the opposite sex.

16  Id. at 494-96.

17     In 1988, the Ninth Circuit considered Michenfelder v. Sumner, in which an inmate alleged

18  that routine visual body cavity searches observed and conducted by female correctional officers

19  violated the Fourth Amendment.  Michenfelder 806 F.2d at 330.  The court considered that the

20  searches were conducted on inmates in the most restrictive unit in the prison and did not involve any

21  touching.  Id. at 332.  While recognizing the inmate's privacy concerns, the Court held that strip

22  searches that involve infrequent or casual observation by members of the opposite sex, or where

23  observation is from a distance, do not unreasonably infringe upon the prisoner's privacy rights.  Id.

24  at 333-334.  The fact that a female correctional officer might be able to view a strip search of male

25  prisoners did not clearly violate a prisoner's privacy rights.  Michenfelder, 860 F.2d at 333.

26  _____

27      [4]The facts here indicate that Plaintiff's clothing was removed so it could be confiscated and he could be
    subjected to a medical examination prior to be placed in management status.  However, since Defendant concedes

28  that a cross gender strip search was conducted, the Court shall proceed directly to the issue of whether the right was
    clearly established at the time of the incident alleged.

1    In 1997, the Ninth Circuit considered an inmate's claim that female officers conducting

2  visual body cavity searches on a regular basis and watching him shower while naked violated his

3  rights under the Fourth Amendment. Somers, 109 F.3d at 616. In Somers, the appellate court noted

4  that this circuit has never held that a prison guard of the opposite sex cannot conduct routine visual

5  body cavity searches of prison inmates or that guards of the opposite sex may not view an inmate

6  showering. Id. at 620. The court found that it was not clearly established that a prisoner's legitimate

7  expectation of bodily privacy prohibits cross gender searches, recognizing that "it is highly

8  questionable even today whether prison inmates have a Fourth Amendment right to be free from

9  routine unclothed body searches by officials of the opposite sex, or from viewing of their unclothed

10  bodies by officials of the opposite sex." Id. at 622.

11    It was not until Byrd v. Maricopa County Sheriff's Dep't, that the Ninth Circuit held that a

12  non-emergency cross-gender strip search was unreasonable and violated the Fourth Amendment.

13  In Byrd, a female cadet conducted a pat down search of the plaintiff, a pretrial detainee, who alleged

14  that she had intentionally squeezed or kneaded his penis or scrotum and improperly touched his anus

15  through his underwear. Byrd 629 F.3d at 1137. The appellate court found that the scope of the

16  intrusion far exceeded searches which have previously been sanctioned and weighed in favor of

17  unreasonableness. Id. at 1142. The court held that the circumstances of the cross gender strip search

18  that was conducted in the absence of an emergency was unreasonable and violated the Fourth

19  Amendment. Id. at 1147.

20    A government official is shielded from liability for damages where his conduct does not

21  violate clearly established rights of which a reasonable person would not have known. Alston, 663

22  F.3d at 1098. In November 2005, it was not clearly established that a routine cross gender strip

23  search or a search observed by members of the opposite sex would violate the Fourth Amendment.

24  See Jackson v. CDCR Employees, No. 1:07-cv-01414-LJO-SKO PC, 2012 WL 443850, *9

25  (E.D.Cal. Feb. 10, 2012) (not clearly established in 2007 that occasionally conducted routine cross-

26  gender strip searches would violate clearly established law); Dean v. Hazewood, No. 2:08-cv-2398-

27  JFM (PC), 2011 WL 4543080, *7 (E.D.Cal. Sept. 28, 2011) (longstanding rule in this circuit has

28  found no constitutional violation for cross gender strip search). Accordingly, Defendant Bryant and

the Doe defendants are entitled to qualified immunity.

**IV.    Conclusion and Order**

For the reasons set forth above, it is HEREBY ORDERED that:

1.      Defendant's motion for summary judgment, filed on February 24, 2012, is GRANTED on the ground of qualified immunity; and

2.      The Clerk of the Court enter judgment in favor of Defendant Bryant and the Doe Defendants, and against plaintiff.  This order concludes this action in its entirety.

IT IS SO ORDERED.

**Dated:    June 4, 2012                      /s/ Barbara A. McAuliffe**
                                        UNITED STATES MAGISTRATE JUDGE