UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL MARTIN, | CASE NO. 1:06-cv-00906-BAM PC |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | (ECF Nos. 73, 79, 80) |
| SULLIVAN, et al., | |
| Defendants. | |

**I.      Background**

Plaintiff Russell Martin ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. The complaint in this action was filed on June 26, 2006. (ECF No. 1.) The parties have consented to the jurisdiction of the Magistrate Judge. (ECF Nos. 3, 39.) On February 24, 2011, Defendant Bryant's motion for summary judgment was granted, and Plaintiff's Eighth Amendment claims based upon a strip search in the presence of female officers was dismissed. Plaintiff was granted leave to file a second amended complaint. (ECF No. 45.) This action is now proceeding on the second amended complaint, filed August 9, 2011, against Defendant Bryant for violations of the Fourth Amendment. (ECF No. 55.) On February 24, 2012, Defendant Bryant filed a motion for summary judgment. (ECF No. 73.) After receiving an extension of time, Plaintiff filed an opposition[1] on April 23, 2012, and Defendant filed a reply on April 30, 2012. (ECF Nos. 79, 80.)

---

[1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on March 20, 2009. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

1

For the reasons set forth below, the Court finds that Defendant Bryant and the unidentified defendants are entitled to summary adjudication on the grounds of qualified immunity.

## II.     Summary Judgment Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, the court is to liberally construe the filings and motions of pro se litigants. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). The "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting Rule 56(c) of the Federal Rules of Civil Procedure).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record for consideration. Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact. Simmons v. Navajo County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

///

III.  **Defendant's Motion for Summary Judgment**

    A.  **Statement of Undisputed Facts[2]**

1. Plaintiff Russell Martin (E-67269) is a California State prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR").

2. Plaintiff was incarcerated in an administrative segregation unit (Ad-Seg) at California Correctional Institution, Tehachapi (CCI) at all times relevant to his Second Amended Complaint. (Martin Dep. 20:17-21; 21:18-22, Dec. 22, 2011.)

3. Defendant M. Bryant was a supervising Correctional Lieutenant at CCI in November 2005. (Bryant Decl. ¶¶ 2, 7, ECF No. 73-3.)

4. On the morning of November 15, 2005, Plaintiff informed a female correctional officer that he was not getting along with his cellmate and needed to be moved. (Martin Dep. 27:20-25; 28:2-5.)

5. Afterwards, Plaintiff packed up his personal property in anticipation of a cell transfer. (Martin Dep. 28:3-6.)

6. Later in the day, when a different correctional officer released Plaintiff for his designated shower time, Plaintiff told the officer that he and his cellmate were not getting along, and that Plaintiff was not going to return to his cell. (Martin Dep. 28:6-9.)

7. The correctional officer put Plaintiff in a holding cell and called the sergeant on duty. Plaintiff informed the sergeant that he and his cellmate were no longer compatible, and Plaintiff asked to be placed in a different cell. (Martin Dep. 28:11-16; Bryant Decl. ¶ 8.)

8. Plaintiff was assigned a new cell in a different housing unit, but his personal property was not immediately transferred to the new cell. (Martin Dep. 28:17-22; 29:3-7; Bryant Decl. ¶ 9.)

---

[2] Plaintiff neither admitted or denied the facts set forth by Defendant as undisputed nor filed a separate statement of disputed facts. Local Rule 260(b). A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e). However, in this instance, neither Plaintiff's second amended complaint nor affidavit in support of opposition has been verified by Plaintiff. Because Plaintiff neither submitted his own statement of disputed facts nor addressed defendants' statement of undisputed facts, the court accepts Defendant's version of the undisputed facts.

9. Defendant Bryant talked with Plaintiff and told him that due to the cell transfer he would receive his personal property after the Security Housing Unit property officer had a chance to process it. (Bryant Decl. ¶ 9.)

10. Plaintiff was upset that his personal property was not transferred to the new cell. (Martin Dep. 28:23-25.)

11. Plaintiff, who is African-American, coordinated a protest with six-to-seven African-American inmates in his new housing unit. All of the inmates agreed to block their cell windows to get the attention of a senior prison official at CCI. (Martin Dep. 29:8-14; 30:5-9; 42:9-43:19; 46:1-12; Bryant Decl. ¶ 10.)

12. It is a violation of CDCR's and CCI's institutional rules for an inmate to block his or her cell window. (Martin Dep. 42:6-8; Bryant Decl. ¶ 11.)

13. A blocked cell window is disruptive to institutional operations, and it presents various threats to institutional security. (Bryant Decl. ¶¶ 11-13.)

14. Correctional staff are statutorily required to perform inmate counts at various times throughout each day, during which correctional staff must account for each inmate through a visual observation to confirm that the inmate is present, alive, and breathing. When an inmate's window is blocked, correctional staff cannot account for that inmate as required by law, necessitating an emergency cell entry. (Cal. Code Regs. tit. 15 § 3274(a) (2011); Bryant Decl. ¶ 12.)

15. A blocked cell window presents an immediate threat to institutional security because staff cannot tell whether an inmate is making weapons, doing drugs, attempting suicide, or otherwise harming himself or his cellmate. Thus, a blocked cell window requires an emergency cell entry because of the unknown threat that a covered window poses to staff and inmate safety. (Bryant Decl. ¶ 13.)

16. The cell windows in Plaintiff's Ad-Seg housing unit were approximately 6 inches wide by 3 feet long, and were the only means of seeing in and out through the housing unit's cell doors. (Martin Dep. 26:11-16.)

17. After Plaintiff and the other African-American inmates blocked their cell windows, several

4

|   |   |
|---|---|
| | correctional officers talked with the men and tried to get them to remove their window coverings, but Plaintiff and the other inmates refused to comply. (Martin Dep. 30:18-21; Bryant Decl. ¶ 14.) |
| 18. | Defendant Bryant directed one of his staff to begin assembling a cell extraction team. (Martin Dep. 30:22-23; 54:15-55:12; Bryant Decl. ¶ 15.) |
| 19. | Because Plaintiff's cell window remained covered, like the cell windows for the other six-to-seven African-American inmates in Plaintiff's housing unit, Defendant Bryant prepared to begin conducting cell extractions for all inmates participating in the group protest. (Martin Dep. 30:22-23; Bryant Decl. ¶¶ 15, 22.) |
| 20. | A cell extraction is when officers dressed in riot gear forcibly remove an inmate from his cell. The extraction begins when officers shoot pepper spray or some other chemical agent into the cell to temporarily incapacitate the inmate, and then enter the cell with haste, restraining the inmate once all members of the cell extraction team are inside. (Martin Dep. 31:5-8.) |
| 21. | Because of the uncertainties involved in a blind cell entry, every cell extraction has the potential for violence and presents an unnecessarily high risk of injury to staff and the inmate(s). (Martin Dep. 31:9-12; Bryant Decl. ¶ 20.) |
| 22. | Both male and female personnel are expected to participate on cell extraction teams. (Bryant Decl. ¶ 21.) |
| 23. | Shortly afterwards, two correctional officers talked with Plaintiff and told him that they would talk to the Facility Captain the following day about Plaintiff's property dispute if Plaintiff would remove his window covering. (Martin Dep. 31:21-23.) |
| 24. | Plaintiff removed his window covering, and he directed the other African-American inmates to remove their window coverings as well. (Martin Dep. 32:6-9.) |
| 25. | After removing his window covering, Plaintiff talked with Defendant Bryant about his personal property dispute. Plaintiff was ordered Plaintiff to "cuff up." (Martin Dep. 32:16-20.) |
| 26. | Defendant Bryant was ordered by the Administrative Office of the Day (AOD) to place |

5

1  Plaintiff on management cell status. (Bryant Decl. ¶ 23.)

2  27. Management cell status is a behavior modification device for disruptive inmates. An inmate placed on management cell status has everything removed from his cell, which becomes a "management cell," and he progressively earns privileges (e.g., writing materials, entertainment appliances) back through good behavior. (Bryant Decl. ¶ 24; Martin Dep. 40:8-11.)

28. Not all inmates placed on management cell status have their clothing privileges revoked. If an inmate had misused his clothing, however, to cover his window or to tie his food port shut, for instance, his clothing would be reduced to a bare minimum while on management cell status. (Bryant Decl. ¶ 25.)

29. After the AOD had ordered Plaintiff to be placed on management cell status, Defendant Bryant told him what was going to happen. Plaintiff initially refused to come out of his cell so that it could be cleared, but after several members of the cell extraction team went to Plaintiff's cell, he decided to come out. (Bryant Decl. ¶ 26.)

30. Plaintiff was handcuffed and taken to a holding cell in the housing unit's day room. (Martin Dep. 32:20-25; Bryant Decl. ¶ 26.)

31. While Plaintiff was in the holding cell, in order to facilitate a medical inspection and because of the potential for Plaintiff to misuse his clothing to block his cell window when returned for management cell status, Defendant Bryant ordered Plaintiff to remove all of his clothing but Plaintiff refused to comply. (Martin Dep. 33:4-8; 54:4-10; Bryant Decl. ¶ 28.)

32. Before an inmate is placed on management cell status, Defendant Bryant always insists that medical staff examine the inmate for any injuries, in order to ensure the inmate's health and safety. (Bryant Decl. ¶ 31.)

33. When Plaintiff refused to remove his clothing, Defendant Bryant ordered correctional staff to remove Plaintiff from the holding cell and to strip him of his clothing. (Martin Dep. 33:8-10; Bryant Decl. ¶ 29.)

34. Two unidentified correctional officers handcuffed Plaintiff, removed him from the holding cell, and removed all of his clothing. (Martin Dep. 53:2-12; Bryant Decl. ¶ 30.)

1  35.  Plaintiff was then visually examined by a female medical technical assistant, lasting five-to-ten seconds. (Martin Dep. 33:19; 61:16-63:10; Bryant Decl. ¶ 30.)

36.  The female medical attendant did not touch Plaintiff's genitals or otherwise contact him at any time. (Martin Dep. 62:23-63:10.)

37.  While Plaintiff was in the day room area, because he was being placed on management cell status for blocking his cell window, two-to-three correctional officers went to his cell and removed the bedding and linens, among other things, in order to remove items Plaintiff could use to cover his windows. (Martin Dep. 33:19-22; 61:4-11; Bryant Decl. ¶ 27.)

38.  Approximately 10-15 male and female correctional officers and medical attendants were present in the day room area while Plaintiff was being examined. (Martin Dep. 54:15-21.) Plaintiff did not recognize any of these officers as among those typically assigned to his housing unit because they apparently came from outside Plaintiff's housing unit to assist with the planned cell extractions. (Martin Dep. 55:2-12.)

39.  Among the group assembled, one female correctional officer and two female medical technical assistants were present. (Martin Dep. 58:14-18; 59:7-10.)

40.  After Plaintiff was visually examined by the female medical technical assistant, he was escorted back to his empty cell, given a pair of paper boxer shorts, and placed on management cell status. (Martin Dep. 33:22-24; 34:2-4; 39:13-15; 64:13-23; Bryant Decl. ¶ 30.)

41.  Plaintiff stayed on management cell status in his empty cell for approximately three days. (Martin Dep. 40:15-16.)

42.  Plaintiff did not earn the return of any privileges during his three-day assignment to management cell status. (Martin Dep. 41:8-10.)

**B.  Defendant's Position**

Defendant Bryant argues that he and the unidentified officers are entitled to qualified immunity because, at the time of the strip search of Plaintiff in November 2005, there was no clearly established law giving a correctional officer notice that conducting a strip search in front of members of the opposite sex would be a violation of an inmate's Fourth Amendment rights. (Motion for

7

Summary Judgment 5, ECF No. 73-1.) A review of case law from the Ninth Circuit demonstrates that Defendant Bryant and the unidentified officers were not on notice that a non-emergency strip search of an inmate in front of female correctional and medical staff would violate a clearly established right in November 2005. (Id. at 7-8.) At that time, the law explicitly permitted cross-gender strip searches and strip searches performed in the vicinity of female correctional personnel on a case-by-case basis. (Id. at 8.) In Grummet v. Rushen, 779 F.2d 491 (9th Cir. 1985), the Ninth Circuit considered a claim by male inmates that female officers viewing them partially or totally nude while showering, being strip searched or using the toilet violated their right to privacy. The Ninth Circuit found no Fourth or Fourteenth Amendment violation and affirmed the grant of summary judgment for prison officials. (ECF No. 73-1 at 7.)

Three years later in Michenfelder v. Sumner, 860 F.2d 328 (9th Cir. 1988), the Ninth Circuit considered whether routine strip searches were unreasonable and violated an inmate's privacy rights when they were conducted within view of female correctional officers. Female officers were not routinely present for the searches and did not conduct the strip searches except in emergencies. The Ninth Circuit recognized that inmates maintain a limited right to bodily privacy, but found that searches were reasonable and did not violate the inmates privacy rights and that the division of responsibilities between male and female guards was a reasonable attempt to accommodate the tension between the inmates privacy rights and the prison's internal security needs. (ECF No. 73-1 at 8.)

Lastly in Somers v Thurman, 109 F.3d 614 (9th Cir. 1997), the Ninth Circuit considered a Fourth Amendment claim arising out of cross gender strip searches where female officers directly participated. (ECF No. 73-1 at 8.) The district court found a clearly established violation, but the Ninth Circuit reversed holding that female officers were entitled to qualified immunity because the male inmates did not have a clearly established Fourth Amendment privacy interest prohibiting cross gender strip searches. The court further observed in dicta that even in 1997, it was highly questionable whether male prisoners had a Fourth Amendment right to be free from routine unclothed searches by female officers or being viewed unclothed by correctional officers of the opposite sex. (Id. at 9.)

It was not until <u>Byrd v. Maricopa Cnty. Sheriff's Dep't</u>, 629 F.3d 1135 (9th Cir. 2011), that the Ninth Circuit determined that a non-emergency search of a male pretrial detainee by a female cadet was a Fourth Amendment violation. Defendant contends that at the time of the search at issue here, <u>Grummet</u>, <u>Michenfelder</u>, and <u>Somers</u> were controlling and a non-routine visual strip search of a male inmate in the presence of female officers did not violate a clearly established right. (ECF No. 73-1 at 9.)

### C. Plaintiff's Position

Plaintiff argues that there are genuine issues of material fact that exist as to whether Defendants violated his Fourth Amendment rights under <u>Byrd</u>.[3] (Affidavit of Russell Martin in Support of his Opposition 1, ECF No. 79.) Plaintiff states that Defendant admits to violating his Fourth Amendment rights and the response was not reasonable, but an exaggerated response to the situation. At the time Plaintiff was strip searched, he had complied with officers and the situation was over. (<u>Id.</u> at 2.)

Plaintiff claims that Defendant Bryant's declaration is false because Defendant Bryant did not talk to him as he claims in his declaration. (<u>Id.</u>) Also, when an inmate is moved from one cell to another he packs up and moves his own property and there was no reason for his property to be processed by the property officer. (<u>Id.</u> at 2-3.) Plaintiff contends that the Court's function is not to weigh conflicting evidence with respect to disputed material facts and, at this stage, is legally precluded from resolving the disputed issues. Plaintiff requests that Defendant's motion for summary judgment be denied. (<u>Id.</u> at 3.)

### D. Defendant's Response

Defendant responds that Plaintiff has failed to address the qualified immunity issue entirely. (Reply 1, ECF No. 80.) While Plaintiff argues that Defendant's conduct would be a violation under <u>Byrd</u>, it is immaterial for the purposes of the qualified immunity analysis. At the time of the incidents alleged in this action, controlling law explicitly counseled that a non-routine, visual strip

---

[3] Plaintiff attempts to include a due process claim in this action. Plaintiff may not now expand the scope of this litigation via deposition testimony or his opposition to Defendant's motion for summary judgment. See <u>Gilmore v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004). Plaintiff's claims are confined to those screened and found cognizable by the Court. (ECF No. 55.)

9

search of a male inmate in the vicinity of female officers did not violate clearly existing law. Plaintiff has offered no argument to the contrary. (Id. at 2.) Plaintiff's allegations that Defendant Bryant's declaration is false is belied by the evidence attached to Plaintiff's opposition. Additionally, it is irrelevant whether Plaintiff spoke with prison officials regarding his personal property being withheld. Even assuming that there was a factual dispute as to whether Plaintiff and Defendant had a conversation regarding Plaintiff's personal property such a dispute is immaterial and cannot defeat summary judgment on the basis of qualified immunity. (Id. at 3.) Defendant Bryant's motion for summary judgment should be granted on the grounds that he is entitled to qualified immunity. (Id. at 4.)

### E. Discussion

The Court finds that Defendant has met his initial burden of informing the Court of the basis for his motion, and identifying those portions of the record which he believes demonstrates the absence of a genuine issue of material fact. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Alston v. Read, 663 F.3d 1094, 1098 (9th Cir. 2011). To determine if an official is entitled to qualified immunity the court uses a two part inquiry. Saucier v. Katz, 533 U.S. 194, 200 (2001). The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established so that a reasonable official would have known that his conduct was unlawful. Saucier, 533 U.S. at 200. A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 818; Alston, 663 F.3d at 1098.

Although Plaintiff argues that genuine issues of material fact exist that preclude the Court from granting Defendant's motion, the inquiry as to whether the right was clearly established is

"solely a question of law for the judge." Dunn v. Castro, No. 08-15957, 2010 WL 3547637, at *2 (9th Cir. Sept. 14, 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th Cir. 2009)). While there are instances where factual disputes prevent the court from deciding the issue of qualified immunity, see Liston v. County of Riverside, 120 F.3d 965, 967 (9th Cir. 1997); Collins v. Jordan, 110 F.3d 1363, 1369 (9th Cir. 1997); Alexander v. City of San Francisco, 29 F.3d 1355, 1364 (9th Cir. 1994); ACT UP!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993), the factual issues which Plaintiff attempts to raise by challenging Defendant's Bryant's deposition are irrelevant to the qualified immunity issue here.

It is undisputed that Plaintiff was unhappy about his personal property being withheld when he was transferred to another cell and encouraged other inmates to participate in a protest to gain the attention of supervisory personnel by violating prison rules. (UF 10, 11, 12.) In response, Defendant Bryant had called for a cell extraction team to assemble to extract the six to seven protesting inmates from their cells. (UF 11, 18.) When the inmates voluntarily removed the coverings from the window of their cells, Plaintiff was removed from his cell in order to place him on management cell status. (UF 24, 26.)

After Plaintiff was taken to a holding cell in the unit's day room, Defendant Bryant ordered that Plaintiff strip so that medical staff could examine him for injuries prior to placing him on management status. (UF 31, 32.) Plaintiff refused to remove his clothing, so Defendant Bryant ordered that Plaintiff be removed from the holding cell and for the correctional officers to remove his clothing. (UF 33.) Plaintiff's clothing was removed by two correctional officers, and Plaintiff was examined by a female medical technical assistant. (UF 34, 35.) The female medical technical assistant did a visual examination, but did not physically touch or contact Plaintiff at anytime. (UF 36.) There were approximately ten to fifteen correctional personal present in the day room, including a female correctional officer and another female medical technical staff. (UF 38, 39.) The relevant inquiry is whether Plaintiff had a clearly established right to not be strip searched by and in front of

correctional and medical personnel of the opposite sex in November 2005.[4]

"For a constitutional right to be clearly established, it contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002). This does not require that the specific actions complained of must have been found to be unconstitutional, but in light of pre-existing law the unlawfulness of the actions must be apparent so the official has fair notice that his conduct would deprive the individual of a constitutional right. Hope, 536 U.S. at 739-40, 122 S. Ct. at 2515.

A prisoner's legitimate expectation of bodily privacy from person's of the opposite sex is extremely limited. Jordan v. Gardner, 986 F.2d 1521, 1524 (9th Cir. 1993). In 1985, the Ninth Circuit decided Grummett v. Rushen, in which male inmates claimed that female officers viewing them partially or totally nude when they showered, dressed, used the toilet, or were strip searched violated their right to privacy. Grummett, 779 F.2d at 492. While recognizing that elementary self-respect and personal dignity compel individuals to desire to shield their unclothed body from the view of strangers and particularly strangers of the opposite sex, the Court found no violation of the Fourth Amendment by the casual observation or pat down search by an official of the opposite sex. Id. at 494-96.

In 1988, the Ninth Circuit considered Michenfelder v. Sumner, in which an inmate alleged that routine visual body cavity searches observed and conducted by female correctional officers violated the Fourth Amendment. Michenfelder 806 F.2d at 330. The court considered that the searches were conducted on inmates in the most restrictive unit in the prison and did not involve any touching. Id. at 332. While recognizing the inmate's privacy concerns, the Court held that strip searches that involve infrequent or casual observation by members of the opposite sex, or where observation is from a distance, do not unreasonably infringe upon the prisoner's privacy rights. Id. at 333-334. The fact that a female correctional officer might be able to view a strip search of male prisoners did not clearly violate a prisoner's privacy rights. Michenfelder, 860 F.2d at 333.

---

[4] The facts here indicate that Plaintiff's clothing was removed so it could be confiscated and he could be subjected to a medical examination prior to be placed in management status. However, since Defendant concedes that a cross gender strip search was conducted, the Court shall proceed directly to the issue of whether the right was clearly established at the time of the incident alleged.

In 1997, the Ninth Circuit considered an inmate's claim that female officers conducting visual body cavity searches on a regular basis and watching him shower while naked violated his rights under the Fourth Amendment. Somers, 109 F.3d at 616. In Somers, the appellate court noted that this circuit has never held that a prison guard of the opposite sex cannot conduct routine visual body cavity searches of prison inmates or that guards of the opposite sex may not view an inmate showering. Id. at 620. The court found that it was not clearly established that a prisoner's legitimate expectation of bodily privacy prohibits cross gender searches, recognizing that "it is highly questionable even today whether prison inmates have a Fourth Amendment right to be free from routine unclothed body searches by officials of the opposite sex, or from viewing of their unclothed bodies by officials of the opposite sex." Id. at 622.

It was not until Byrd v. Maricopa County Sheriff's Dep't, that the Ninth Circuit held that a non-emergency cross-gender strip search was unreasonable and violated the Fourth Amendment. In Byrd, a female cadet conducted a pat down search of the plaintiff, a pretrial detainee, who alleged that she had intentionally squeezed or kneaded his penis or scrotum and improperly touched his anus through his underwear. Byrd 629 F.3d at 1137. The appellate court found that the scope of the intrusion far exceeded searches which have previously been sanctioned and weighed in favor of unreasonableness. Id. at 1142. The court held that the circumstances of the cross gender strip search that was conducted in the absence of an emergency was unreasonable and violated the Fourth Amendment. Id. at 1147.

A government official is shielded from liability for damages where his conduct does not violate clearly established rights of which a reasonable person would not have known. Alston, 663 F.3d at 1098. In November 2005, it was not clearly established that a routine cross gender strip search or a search observed by members of the opposite sex would violate the Fourth Amendment. See Jackson v. CDCR Employees, No. 1:07-cv-01414-LJO-SKO PC, 2012 WL 443850, *9 (E.D.Cal. Feb. 10, 2012) (not clearly established in 2007 that occasionally conducted routine cross-gender strip searches would violate clearly established law); Dean v. Hazewood, No. 2:08-cv-2398-JFM (PC), 2011 WL 4543080, *7 (E.D.Cal. Sept. 28, 2011) (longstanding rule in this circuit has found no constitutional violation for cross gender strip search). Accordingly, Defendant Bryant and

13

1  the Doe defendants are entitled to qualified immunity.

**IV.**     **Conclusion and Order**

For the reasons set forth above, it is HEREBY ORDERED that:

1. Defendant's motion for summary judgment, filed on February 24, 2012, is GRANTED on the ground of qualified immunity; and
2. The Clerk of the Court enter judgment in favor of Defendant Bryant and the Doe Defendants, and against plaintiff.  This order concludes this action in its entirety.

IT IS SO ORDERED.

Dated:   **June 4, 2012**              /s/ **Barbara A. McAuliffe**
                                       UNITED STATES MAGISTRATE JUDGE